**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AMY BECKWITH,

             v.                            No. 13-CV-1095
                                               (MAD/CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                             Defendant.

_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                      **OF COUNSEL:**

Office of Peter W. Antonowicz        PETER W. ANTONOWICZ, ESQ.
148 West Dominick Street
Rome, New York 13440

Social Security Administration        HEETANO SHAMSOONDAR, ESQ.
Office of Regional General Counsel Region II  Special Assistant U.S. Attorney
26 Federal Plaza - Room 3904
New York, New York 1278

### REPORT-RECOMMENDATION AND ORDER[1]

       Plaintiff Amy B. Beckwith ("Beckwith") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying

her application for disability insurance benefits ("DIB") and supplemental security income

("SSI") under the Social Security Act ("Act"). Beckwith moves for a finding of disability, and the

Commissioner cross-moves for a judgment on the pleadings. Dkt. No. 15; Dkt. No. 18.

_____

      [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636 (b) and N.D.N.Y.L.R. 72.3 (c).

For the following reasons, it is recommended that the matter be remanded.

## I. **Background**

### A. **Facts**

Born on January 14, 1978, Beckwith was thirty-two years old on the alleged disability onset date. See, e.g., Dkt. No. 9-3, at 2.[2] On June 24, 2010, Beckwith suffered a left middle cerebral artery stroke. Dkt. No. 9-7, at 3, 5, 135-37. She was hospitalized for six days, and subsequently treated with Coumadin, Lipitor, Lovenox, and, as needed, Tylenol. Dkt. No. 9-7, at 5. She also attended speech and occupational therapies while admitted, and was given a referral to continue with outpatient treatment. Id. at 136. At the time of her discharge from the hospital, Beckwith complained of difficulty "finding words," but her speech was reported as "close to baseline" and her comprehension was normal. Id. at 136. She also noted some weakness in her right hand. Id. at 135. Beckwith thereafter complained of headaches – which she attributed to the stroke – and difficulty sleeping through the night due to pain in her legs. Dkt. No. 9-2, at 57-58. She explained that the difficulty sleeping led to fatigue during the day and required her to take daytime naps. Id. at 58. She also alleged trouble communicating and stated that she needed reminders to take her medication. Id. Beckwith can assist with some household chores, such as preparing meals, grocery shopping, and folding laundry if she is given assistance or a reminder. Id. at 59-60. She also assists with some child care duties while her boyfriend is at work, but most of the child care responsibilities are handled by her boyfriend. Id. at 59. Beckwith has a

---

[2]    Citations to page numbers within the record refer to the pagination generated by CM/ECF, not the page numbers of the original documents.

medical history of hypertension and a miscarriage.  Dkt. No. 9-7, at 135.

Beckwith graduated from high school and worked for six years as a cashier at Wal-Mart until her alleged disability onset date, June 24, 2010.  Dkt. No. 9-2, at 54-55.  She previously worked as an assistant manager at Dollar General and as a babysitter.  Id.  She has been unemployed since her stroke.  Dkt. No. 9-6, at 3. She lives with her boyfriend and their four minor children.  Dkt. No. 9-2, at 58-59.

## B. **Procedural History**

On July 2, 2010, Beckwith protectively filed a Title II application for a period of disability and disability insurance benefits and protectively filed a Title XVI application for SSI claiming an onset date of June 24, 2010.  Dkt. No. 9-6, at 4, 10.  Those applications were denied on September 24, 2010.  Dkt. No. 9-4, at 2-6.   Beckwith filed a request for a hearing.  Id. at 10-11.  A hearing was held before an Administrative Law Judge ("ALJ") on September 6, 2011 and January 30, 2012.  Dkt. No. 9-2, at 39-68.  In a decision dated February 28, 2012 (Dkt. No. 9-2, at 22-33), the ALJ determined that Beckwith was not entitled to disability benefits.  Id. at 2.  Beckwith timely filed a request for review.  Id. at 17. On August 9, 2013, the Appeals Council denied Beckwith's request for review, finalizing the ALJ's decision.  Id. at 10-14.  Thereafter, Beckwith commenced this action.

## C. **Examinations/Consultations**

Beckwith had been treating with Dr. Nicoletta Tallandini, M.D. ("Dr. Tallandini"), her primary care physician, since 1996.  Dkt. No. 9-7, at 179.  On June 27, 2011, Dr. Tallandini

reported on a Medical Source Statement - physical ("Stroke Residual Functional Capacity Questionnaire") that Beckwith had no physical limitations on the number of hours that she can sit in a typical workday, but had a thirty-minute standing limit. Id. at 180-81. Dr. Tallandini reported that Beckwith suffered from headaches, difficulty remembering, confusion, difficulty solving problems, and also had problems with judgment. Id. at 179. She further reported that Beckwith "often" had difficulty with pain or fatigue that is severe enough to interfere with attention and concentration." Id. at 180. Dr. Tallandini recommended that Beckwith avoid concentrated exposure to fumes, odors, dust, and gases. Id. at 183. She checked "yes" to a question that asked whether Beckwith's impairments were likely to cause good and bad days, and concluded that Beckwith would likely be absent from work about four days per month. Id. at 183-84. Dr. Tallandini concluded that Beckwith's symptoms were "reasonable [sic] consistent" with the "symptoms and functional limitations described in [her] evaluation." Id. at 180. Dr. Tallandini reported that Beckwith's prognosis was "fair." Id. Finally, Dr. Tallandini concluded that Beckwith was "capable of low stress jobs." Id. at 181.

In a Medical Source Statement-mental dated January 27, 2012, Dr. Tallandini reported that Beckwith had (1) a "moderate" ability to deal with the public and maintain her personal appearance; and (2) "marked" difficulty in: following rules; relating to family and acquaintances; using judgment; relating to authority figures; dealing with stress; functioning independently; maintaining attention and concentration; understanding; remembering; carrying out simple, detailed, and complex instructions; behaving in an emotionally-stable manner; relating predictably in social situations; and demonstrating reliability. Dkt. No. 9-7,

at 217-18.  Her "reported diagnosis" was "S/P[3] CVA,[4] migraines, deficit's [sic] in memory & ability to concentrate."  Id. at 218.  Dr. Tallandini further reported that Beckwith could manage benefits with assistance.  Id.  She concluded that Beckwith's impairments were likely to produce good and bad days.  Id. at 219.  Finally, Dr. Tallandini reported that Beckwith would likely be off task at least fifty percent of the time in an eight-hour work day and absent more than four days per month.  Id.

Kelly Mangione, MS, CC-SLP, Beckwith's treating speech therapist, completed an initial evaluation on July 14, 2010.  Dkt. No. 9-7, at 8-12.  Beckwith "presented with clear and intelligible speech production."  Id. at 9.  No vocal dysfunction was observed, and Mangione determined that Beckwith's reading and writing abilities appeared to be at her premorbid levels.  Id.  Beckwith was given the Western Aphasia Battery-Revised assessment and scored a 92.7 out of 100, indicating "mild aphasic deficit."  Id. at 8.  Beckwith provided "appropriate responses" to conversational questions during the Spontaneous Speech subtest.  Id.  In the Auditory Verbal Speech subtest, Beckwith "presented with functional comprehension as evident by correctly answering complex yes/no questions and multiple-step commands."  Id.  Beckwith "had no significant difficulties with the Repetition subtest."  Id.  In the Naming and Wording Finding test, Beckwith "named objects, named animals given a time restriction, completed sentences, and provided appropriate responses to questions with minimal difficulty."  Id.  She "struggled slightly with

---

[3] S/P is an abbreviation for status post. MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=83046 (last visited Jan. 22, 2015).

[4] CVA is an abbreviation for cerebrovascular accident.  MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=22122 (last visited Jan. 22, 2015).

the time restricted naming task and was only able to name 7 animals in one minute." Id. Further, Mangione observed that Beckwith's word finding difficulties "mildly impacted her during conversation." Id. However, Beckwith's RIPA-2 score reflected "moderate to severe cognitive deficits." Id. at 9. Mangione noted that Beckwith's "processing varied greatly throughout the evaluation; at times she was quick to respond but at other times she struggled to gather her thoughts." Id. However, Mangione observed that Beckwith's "difficulty with processing was not consistent with one type of task or assessment." Id. When asked to read a short paragraph and answer questions, Beckwith could recall information to answer all questions. Id. Thus, Mangione concluded that the RIPA-2 score "does not reflect [Beckwith's] true abilities; she may have begun to fatigue during the last portion of testing." Id. Mangione concluded that Beckwith's testing results were "very inconsistent, and noted that Beckwith "didn't appear completed [sic] engaged during the evaluation." Id. Despite the "significant deficits" found during cognitive testing, Mangione "believed that [Beckwith's] answers/responses were not reflective of her true capabilities." Id. For the reporting period between July 21, 2010 and August 21, 2010, Mangione noted that Beckwith continued to present inconsistent word finding difficulties. Dkt. No. 9-7, at 13. She further noted that Beckwith "demonstrates very functional speech in conversation during session, as well as in OT (per OT), and [with] others in waiting area." Id. Beckwith "initially stated cog[nitive] deficits were not new but later stated they were as a result of stroke. Malingering cannot be ruled out at this time." Id.

Consulting psychologist Dennis M. Noia, Ph.D. ("Dr. Noia"), performed a psychiatric examination of Beckwith on or about September 20, 2010. Dkt. No. 9-7, at 70-73. Dr. Noia concluded that Beckwith's "attention and concentration was in tact" as Beckwith was "able

to do counting, some simple calculations (with difficulty), and serial 3s." Id. at 72. Dr. Noia further concluded that Beckwith's "recent and remote memory skills were moderately to severely impaired. She was able to recall three objects immediately but none after five minutes; restate 5 digits forward and 2 digits backward." Id. Dr. Noia found Beckwith's voice clear and speech fluent, with adequate receptive and expressive language. Id. at 71. Further, he found her thought processes to be "goal directed with no evidence of delusions, hallucinations, or disordered thinking." Id. at 72. Beckwith reported to Dr. Noia that she is able to dress, bathe, and groom herself; cook and prepare food with assistance; shop with assistance; help care for her children; and get along with friends and family. Id. She reported that she cannot complete general cleaning or laundry, manage money, drive, or use public transportation. Id. Dr. Noia concluded that Beckwith "appear[ed] to be capable of understanding and following simple instructions and directions," "capable of performing simple and some complex tasks with supervision and independently," and "capable of maintaining attention and concentration for tasks." Id. Further, he concluded that she "can regularly attend to a routine and maintain a schedule" and appears "capable of making appropriate decisions," "relat[ing] to and interact[ing] moderately well with others," and "capable of dealing with stress." Id. at 73. Dr. Noia ultimately concluded that the examination results "are consistent with a possible cognitive disorder following her stroke" and "recommended that Ms. Beckwith be evaluated for the possibility of a cognitive disorder." Id.

Consulting psychologist, Dr. T. Andrews ("Dr. Andrews"), using a Mental Residual Functional Capacity Assessment, reported that Beckwith is "moderately limited" in her ability to understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; and respond appropriately to changes in the work setting. Dkt. No. 9-7, at 92-94.   It does not appear that Dr. Andrews examined Beckwith.

Consultative examiner, David Stang, Psy.D. ("Dr. Stang"), administered to Beckwith the Weschler Adult Intelligence Scale - Fourth Edition, resulting in a full-scale IQ score of 71, a low-borderline range of intelligence. Dkt. No. 9-7, at 208.  He concluded that Beckwith's visual abilities were "significantly stronger" than her verbal and auditory abilities. Id.  Her perceptual reasoning skills were tested in the upper low average range, and her visual processing speed abilities were in the upper borderline range.  Id.  By contrast, her verbal comprehension and auditory working memory abilities tested in the mildly deficient range.  Id.  Dr. Stang concluded that "[i]n terms of evidence of cognitive deterioration, due to a stroke, there is all likelihood that her verbal reasoning, verbal fluency, short- and long-term auditory memory have declined." Dkt. No. 9-7, at 208.  Dr. Stang concluded, however, that "the evidence is somewhat ambiguous" because

> on none [sic] hand, it is certainly possible that [Beckwith] has always had stronger perceptual reasoning and visual processing abilities, as opposed to verbal and auditory working memory abilities . . . [h]owever, assuming that she did graduate high school with a B average, and assuming that her expressions of frustration and embarrassment while she took the vocabulary and information subtest are valid, there is a likelihood that her verbal memory has deteriorated.

Id.  Dr. Stang observed Beckwith's claims that she "can no longer articulate the meanings of some very basic words," and "appeared quite frustrated when it became clear that she could not recall the identity of Martin Luther King . . . the meaning of the equator, or the chemical composition of water."  Id. at 208.  She showed "clear deficits with her performance at the digit span exercises," but her visual memory "appears to be intact, as evidenced by her performance with the Bender-Gestalt II exercises."  Id.  Dr. Stang further

concluded that Beckwith's ability to adapt emotionally, her social judgment, and her basic communication skills appeared intact, but that "it is quite probable that her range of vocabulary has become limited." Id. at 208-209. Dr. Stang recommended that Beckwith's neuropsychological deficits need to be assessed by a neurologist and that she "might be able to benefit from neuropsychological rehabilitation." Id. at 209.

Thereafter, Dr. Stang concluded, through the "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form, that Beckwith had (1) marked difficulties in understanding and remembering complex instructions, making judgments on complex work-related decisions, and responding appropriately to usual work situations and to changes in a routine work setting; (2) moderate difficulties in carrying out complex instructions; and (3) mild difficulties in understanding, remembering, and carrying out simple instructions; making judgments on simple work-related decisions; and interacting appropriately with the public, supervisors, and coworkers. Dkt. No. 9-7, at 212-13. In support of his assessment, Dr. Stang concluded that Beckwith's "intellectual assessment results indicate significant deficits at verbal memory, but only low average visual intelligence." Id. at 212. Further, he concluded that Beckwith's "ability to respond to new situations is limited by intellectual deficits." Id. at 213.

Consulting provider Kalyani Ganesh, M.D. ("Dr. Ganesh"),[5] a neurologist, examined Beckwith on September 20, 2010. Dkt. No. 9-7, at 74-77. Dr. Ganesh did not complete labs or other testing. Id. at 76. Dr. Ganesh observed that Beckwith "is able to speak" and that during the examination, her speech was "limited, but intelligible." Id. at 74. Dr. Ganesh

---

[5] The Court takes judicial notice of the fact that Dr. Kalyani Ganesh is a neurologist.

also noted that Beckwith's right arm strength "has returned to near normal." Id. Beckwith's hand and finger dexterity was intact, her right grip strength was 4-5/5, her left grip strength was 5/5, and she was "able to use her hands quite freely. No difficulties noted." Id. at 76. Dr. Ganesh also observed that Beckwith had "no gross physical limitations noted to sitting, standing, waking, or the use of upper extremities." Id.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that the record contains "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, if the record contains substantial support for the ALJ's decision, a court cannot substitute its interpretation of the administrative record for that of the Commissioner. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). As long as the Commissioner's finding is supported by substantial evidence,

it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## B.  **Determination of Disability**[6]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

---

[6]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec'y of Health and Human Servs. of the United States, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (line spacing added); 20 C.F.R. §§ 404.1512(g); 404.1520(d), (e); 404.1525-.1526; 404.1545; 404.1560(b), (c); 404.1520(g ); 404.1565; 404.920(d), (g); 416.912(g); 416.920(3); 416.960 (c); 416.965; 416.1520(f ). The plaintiff bears the initial burden of proof to establish the first four steps. See DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry reaches the final step, the burden shifts to the Commissioner to demonstrate that the plaintiff is still able to engage in gainful employment. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C.  ALJ's Findings

Beckwith, represented by counsel, testified via videoconference at a hearing on September 6, 2011 before ALJ Koennecke. Dkt. No. 9-2, at 49-63. Beckwith's live-in boyfriend Robert Wright also testified. Id. at 63-68. Finally, a vocational expert testified. Id. at 40-48. Using the test set forth in 20 C.F.R. § 404.1520, the ALJ determined that Beckwith (1) "meets the insured status requirements of the Social Security Act through December 31, 2015"; (2) "has not engaged in substantial gainful activity since June 24, 2010, the alleged onset date"; (3) "has the following severe impairment: residuals of a cerebral vascular accident"; (4) "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1"; (5) "is unable to perform any past relevant work"; (6) "has the residual functional capacity to perform a full range of work at all exertional levels[,] . . . retains the ability . . . to frequently understand, carry out, and remember simple instructions; to frequently respond appropriately to supervision, coworkers, and usual work situations; and rarely deal with changes in a routine work setting . . ."; and (7) is able to perform jobs that exist in the national economy. Id. at 24-32. Therefore, the ALJ reached a finding of no disability. Id. at 33.

### D. **Beckwith's Arguments**

Beckwith contends that the ALJ failed to give controlling weight to the opinions of her treating physician, Dr. Tallandini. She further contends that the ALJ failed to properly develop the administrative record when she declined to request clarification from the treating physician or order additional testing. Finally, Beckwith argues that the ALJ improperly assessed her credibility. Dkt. No. 15, at 11-13.

1. **Weight to Give Treating Physician/Duty to Develop Record**

A treating physician's opinion on the nature and severity of a plaintiff's impairments will be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); Halloran, 362 F.3d at 32. "Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions of other medical records, 'not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician.'" Flagg v. Astrue, No. 11-CV-00458 (LEK), 2012 WL 3886202, at *10 (N.D.N.Y. Sept. 6, 2012) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)). If substantial evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and "the less consistent the opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (citation omitted). Moreover, as the ultimate conclusion whether a plaintiff is disabled and cannot work is reserved to the Commissioner (20 § C.F.R. 404.1527(e)(1)), "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133.

Should the ALJ decline to give controlling weight to a treating physician, he or she "must still consider various 'factors' in deciding how much weight to give the opinion." Petrie v. Astrue, 412 F. Appx. 401 (2d. Cir. 2011). The ALJ considers: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel,

134 F.3d 496, 503 (2d Cir. 1998); <u>see</u> 20 CFR § 404.1527(c)(2).  Where the ALJ rejects the

treating physician's opinions or otherwise determines that they are not controlling, she must

set forth her reasoning with specificity.  20 C.F.R. §§ 404.1527(c)(2); <u>see</u>, <u>e.g.</u>, <u>Doyle v.</u>

<u>Apfel</u>, 105 F.Supp.2d 115, 119 (E.D.N.Y. 2000).  An ALJ's "[f]ailure to provide [explicit] good

reasons for not crediting a treating source's opinion is ground for remand." <u>McClaney v.</u>

<u>Astrue</u>, No. 10-CV-5421 (JG)(JO), 2012 WL 3777413, at *16 (quoting <u>Snell</u>, 177 F.3d at

134).  However, "where the evidence of record permits [the court] to glean the rationale of

an ALJs decision," the ALJ need not "have mentioned every item of testimony presented to

him [or her] or have explained why he [or she] considered particular evidence unpersuasive

or insufficient to lead him [or her] to a conclusion of disability." <u>Petrie</u>, 412 F. Appx. at 407.

Ultimately, the final determination of disability and a claimant's ability to work rests with the

Commissioner.  <u>Id.</u> at 133-34; <u>see</u> 20 C.F.R. § 404.1527(e) (2005).

    The treating physician's rule goes "hand in hand" with the ALJ's duty to develop the

record.  <u>Batista v. Barnhart</u>, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004).  It is well settled that

an ALJ has an affirmative duty to develop the administrative record during Social Security

hearings, even where the claimant is, as in this case, represented by counsel.  <u>See</u> 20

C.F.R. § 404.1512(e) (explaining that the Commissioner will attempt to retrieve the entire

medical history from the claimant's treating sources rather than always seeking consultative

examinations); <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); <u>see</u> <u>also</u>

20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical

history for at least the [twelve] months preceding the month in which [claimant] file[s an]

application . . . ."); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998) ("[T]he

lack of specific clinical findings in the treating physician's report [does] not, standing by

itself, justify the ALJ's failure to credit the physician's opinion . . . . [E]ven if the clinical findings were inadequate, it [i]s the ALJ's duty to seek additional information from [the treating physcian] sua sponte.") (internal citation omitted).   Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Shrock v. Colvin, 12-CV-1898 (MAD/CFH), 2014 WL 2779024, at *9 (quoting Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted) and Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted)); Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (stating that where a "'medical record paints an incomplete picture of [the claimant's] overall health during the relevant period, [as] it includes evidence of the problems . . . the ALJ had an affirmative duty to supplement [the] medical record, to the extent it was incomplete, before rejecting [the claimant's] petition . . . .'") (quoting Webb, 433 F.3d at 687).

### a. **June 27, 2011 report/opinion**

Here, the ALJ declined to give controlling weight to Dr. Tallandini's opinions.  Dkt. No. 9-2, at 30.  The ALJ gave "some weight" to Dr. Tallandini's June 27, 2011 residual functional capacity questionnaire, which concluded that Beckwith could stand for thirty minutes at one time, had no limits on hours she could sit at one time, had no other physical limitations, and was capable of low-stress jobs, as these conclusions were "generally

consistent" with the rest of the record. Dkt. No. 9-2, at 29. However, the ALJ contended that there was "no neurological testing" in Dr. Tallandini's notes, no reason documented as to why Beckwith's ability to stand was limited to thirty minutes at one time," and further noted that Dr. Tallandini "is not the claimant's treating neurologist and sees her only occasionally." Id. Although contending that the June 2011 residual functional capacity report was "generally consistent" with other record evidence, the ALJ concluded that the physical limitations set forth in the report were inconsistent with the opinion of Dr. Ganesh and were not supported by sufficient clinical evidence, specifically a neurological report. Dkt. No. 9-2, at 29.

Certainly, where an ALJ declines to give controlling weight to a treating physician and then determines the weight to afford to that physician's opinions, the ALJ may consider whether the physician is a specialist, the nature of the relationship, as well as the kind of evidence supporting the doctor's opinions. 20 CFR § 404.1527(c)(2). However, as noted, even where the ALJ determines that the physician's clinical findings are inadequate, "it [i]s the ALJ's duty to seek additional information from [the treating provider] sua sponte." Clark, 143 F.3d at 118. To the extent that the ALJ believed that Dr. Tallandini's assessment of Beckwith's physical restrictions were unsupported, she had a duty to attempt to obtain a clarification or additional information from Dr. Tallandini in order to have a complete record. See 20 CFR § 404.1512(e)(1).

b. **January 27, 2012 report/records**

The ALJ gave "little or no weight" to Dr. Tallandini's January 27, 2012 report. Id. at 31. In explaining why, the ALJ opined that Dr. Tallandini's 2012 opinion was "inconsistent

with an earlier opinion" Dr. Tallandini rendered and "amounts to a standard 'check a box' or 'fill in a blank' form containing minimal commentary and no supporting attachments." Dkt. No. 9-2, at 30-31. She also rejected this form was because it related to the ultimate issue of disability, which is a question for the Commissioner. Id. at 31. Further, the ALJ concluded that Dr. Tallandini's opinion on residual functional capacity "was contradicted by [her] own treatment records and clinical findings" and improperly "related to the ultimate issue of disability, which is reserved for the Commissioner." Id. at 30-31. She also concluded that Dr. Tallandini's remaining "reports and treatment notes" did not include a neurological evaluation, and, thus, "can properly be rejected." Id. at 31. The ALJ declined to contact Dr. Tallandini for clarification, concluding that her reports did not lack clarity, but were unsupported. Id. at 31.

First, in concluding that Dr. Tallandini's 2012 residual functional capacity assessment was contradicted by her "treatment records and clinical findings," the ALJ failed to specify *which* treatment records and clinical findings she believed supported her rejection of the opinion. See Dkt. No. 9-2, at 31. An ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33. It is well settled an ALJ is not required to "mention[] every item of testimony presented . . . or have explained why he [or she] considered particular evidence persuasive or unpersuasive" where the Court can glean the ALJ's rationale from record evidence (Petrie, 412 Fed. Appx. at 407); however, the Court cannot glean from the record the contradiction within the "treatment records and clinical findings" to which the ALJ is referring.[7] Dkt. No. 9-

_____

[7] The Court recognizes that there may be inconsistencies between Dr. Tallandini's 2011 and 2012 medical source statements. In her 2011 report, Dr. Tallandini stated that

7, at 31; Petrie, 412 Fed Appx. at 407. The ALJ's failure to cite the specific treatment records or clinical findings is compounded by the fact that a significant portion of Dr. Tallandini's submissions were handwritten and largely illegible. See Dkt. No. 9-2, at 378-407, 68-79, 491-92. Although the Court is unaware whether these records would have provided such support had they been submitted in a readable form; it cannot be said that the records do not provide sufficient support when they are essentially indecipherable.

Second, insofar as the ALJ concluded that Dr. Tallandini's 2012 medical source statement was not supported by sufficient explanation (Dkt. No. 9-2, at 31), the ALJ had an "affirmative duty to develop the record and seek additional information from the treating physician" in order to determine upon what information the treating provider was basing her opinions. Colegrove v. Comm'r of Soc. Sec., 399 F.Supp.2d 185, 196 (W.D.N.Y. 2005); see also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."). The Commissioner contends that the ALJ had no obligation to develop the

---

Beckwith was likely unable to work three days per month and could handle a low stress job, as compared with her 2012 report concluding that Beckwith would miss work four or more days per month. Dkt. No. 9-7, at 181, 183, 219. However, based on the context surrounding the ALJ's discussion of the treatment records and clinical findings, the Court concludes that the reports are not the inconsistency to which the ALJ refers when she wrote of the treatment records and clinical findings (Dkt. No. 9-2, at 31, ¶1). First, the ALJ pointed out the "inconsiste[cy]" between the reports earlier in the same paragraph that she discussed inconsistencies in the treatment records and findings (Dkt. No. 902, at 30 ¶ 5). Second, it does not appear that a medical source statement would fall into the category of a treatment record or clinical finding. To the extent that the ALJ found that Dr. Tallandini's 2011 and 2012 reports were inconsistent with one another (Dkt. No. 9-2, at 30), she had an obligation to contact her to resolve the conflict or apparent ambiguity. 20 CFR 404.1512(e)(1).

record as the ALJ possessed a complete medical history and there were no obvious gaps in the record. Dkt. No. 18, at 13. However, to the extent that the ALJ determined that some of Dr. Tallandini's opinions were "insufficiently explained, lacking in support or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010); see Clark, 143 F.3d 115, 118; Richardson v. Apfel, 44 F. Supp. 2d 556, 563 (S.D.N.Y. 1999) (concluding that where a treating physician's records appeared to conflict, the ALJ has an affirmative obligation to attempt to secure additional clinical or objective support). Indeed, although the ALJ concluded that there "is nothing in the records that the doctor could use to clarify [her] opinion" (Dkt. No. 9-2, at 31), it is possible that, "'if asked,' [Dr. Tallandini] could have provided sufficient explanation for any seeming lack of support . . . ." by submitting clinical findings for her conclusions that Beckwith had a limit to the amount of time she could sit and had severe cognitive limitations. See Rosa, 168 F.3d at 79 (quoting Clark, 143 F.3d at 118. Thus, because the ALJ concluded that there existed a conflict within Dr. Tallandini's records, the ALJ had an affirmative duty to secure readable records or obtain an explanation from the doctor. See id.

Further, the Court disagrees with the Commissioner's argument that there was no obvious gap in the record. The ALJ "rejected" Dr. Tallandini's opinions in part because they did not include a neurological evaluation, noting that "the only testing actually performed was by the consultative examiner." Dkt. No. 9-2, at 30. The Court observes that the only neurological evaluations within the record are limited to physical assessments. Neurologist Helen Markan performed a physical examination of Beckwith shortly following her stroke.

Dkt. No. 9-7, at 139-40. Similarly, neurologist Dr. Simonescu performed a follow-up physical evaluation of Beckwith, but did not perform a cognitive assessment. Id. at 175-76. Finally, neurologist Dr. Ganesh evaluated and assessed Beckwith's physical limitations, but not her cognitive impairments. Dkt. No. 9-7, at 74-77. Moreover, after observing "moderate to severe" and "marked" deficits in Beckwith's memory skills, two consulting examiners, psychologists Stang and Noia, recommended further neurological or cognitive testing. Dkt. No. 9-7, at 73, 212. The ALJ did not seek this testing. Thus, insofar as the ALJ suggested, in rejecting Dr. Tallandini's report, that a neurological evaluation addressing Beckwith's cognitive abilities was necessary for a proper determination of the nature and severity of Beckwith's cognitive impairments, she had a duty to seek out such examination in order to fulfill her duty of developing the administrative record. See Richardson, 44 F.Supp.2d at 563.

        In sum, because the ALJ failed to (1) provide with specificity the contradiction within Dr. Tallandini's treatment records and clinical findings, and (2) failed to sufficiently develop the administrative record, it is recommended that the Court remand to the SSA so that the ALJ can properly develop the relevant record and reassess whether a different conclusion is warranted.


                            2. **Credibility Determination**

        The ALJ found Beckwith's statements as to her limitations to be "not credible" in light of several factors, including Beckwith's reported symptoms, her treatment providers' assessments of her self-reported symptoms, her use of medication, the timing of her complaints, her description of her daily activities, and her boyfriend's description of her daily

activities and symptoms. Dkt. No. 9-2, at 28-29. Because the record was not fully and properly developed, the ALJ's assessment of Beckwith's credibility was determined based upon an incomplete picture of the evidence.

Accordingly, it is recommended that the Court remand to the SSA, and on remand, the ALJ reevaluate Beckwith's credibility in light of any new evidence to be adduced. See Rosa, 168 F.3d at 83 (instructing the ALJ to reassess the claimant's credibility after further development of the record).

### III. **CONCLUSION**

Because "the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate," rather than remand for a calculation of benefits. Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir.2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005). Therefore, it is recommended that Beckwith's motion for judgment on the pleadings (Dkt. No. 15) be **GRANTED in part** and **DENIED in part**, the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 18) be **DENIED**, and this case **REMANDED** to the SSA for further proceedings consistent with this opinion. Specifically, it is recommended that, on remand, the Commissioner be directed to:

1. Develop the record to seek an explanation for perceived inconsistencies between Dr. Tallandini's reports and her treatment records and clinical findings;

2. Develop the record by obtaining a neurological evaluation that assesses Beckwith's alleged cognitive impairments;

3. Reevaluate the weight of the medical evidence in light of this opinion and any

newly-obtained evidence;

4. Reassess Beckwith's credibility in light of this opinion and any newly-obtained evidence.

Pursuant to 28 U.S.C. § 636 (b) (1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636 (b) (1) (B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Heath and Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6 (a), 6 (e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: February 3, 2015
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge